UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

```
----------------------------------x
MILSO INDUSTRIES CORPORATION,      :
                                   :
                Plaintiff,         :
                                   :
v.                                 :   Civ. No. 3:08CV1026(AWT)
                                   :
EDWARD C. NAZZARO, LIBERTY CASKET  :
COMPANY, EDWARD LARKIN and         :
KIRK A. BOGGIA,                    :
                                   :
                Defendants.        :
----------------------------------x
```

**RULING ON CROSS MOTIONS FOR SUMMARY JUDGMENT**

The plaintiff, Milso Industries Corporation ("Milso"), brings this action against the defendants, Edward C. Nazzaro ("Nazzaro"), Liberty Casket Company ("Liberty"), Edward Larkin ("Larkin") and Kirk A. Boggia ("Boggia"), setting forth a claim in the First Cause of Action for breach of contract against Nazzaro and Larkin; a claim in the Second Cause of Action for misappropriation of trade secrets under the Connecticut Uniform Trade Secrets Act ("CUTSA"), Conn. Gen. Stat. § 35-50 et seq., against all the defendants; a claim in the Third Cause of Action for breach of fiduciary duties, including the duty of loyalty, against Nazzaro and Larkin; a claim in the Fourth Cause of Action for aiding and abetting breach of fiduciary duty against Liberty and Boggia; a claim in the Fifth Cause of Action for unjust enrichment against all the defendants; a claim in the Sixth Cause of Action for tortious interference with contractual relations

1

against Nazzaro, Liberty and Boggia; a claim in the Seventh Cause of Action for interference with business expectancies against all the defendants; a claim in the Eighth Cause of Action for unfair competition under the Connecticut Unfair Trade Practices Act ("CUTPA"), Conn. Gen. Stat. § 42-110 et seq., against all the defendants; a claim in the Ninth Cause of Action for conversion against all the defendants; a claim in the Tenth Count for civil conspiracy against all the defendants; a claim in the Eleventh Cause of Action for false designation of origin in violation of § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), against Liberty; and a claim in the Twelfth Cause of Action for false advertising in violation of § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), against Liberty.  (See Second Am. & Supplemental Compl. (Doc. No. 85).)  Nazzaro and Liberty set forth two counterclaims, in the First Counterclaim a request for a declaratory judgment, and in the Second Counterclaim an unfair trade practices claim under CUTPA, alleging "sham" litigation.  (See Answer & Affirmative Defenses to Am. Compl. (Doc. No. 53).)  The plaintiff and the defendants have each moved for summary judgment on all the plaintiff's causes of action and both of the defendants' counterclaims, except that the plaintiff has not moved for summary judgment on the Third and Fourth Causes of Action as to claims involving conduct of Larkin.  For the reasons set forth below, both motions for summary judgment are being granted in

part and denied in part.

## I.   FACTUAL BACKGROUND

In 2005, The York Group, Inc. ("York"), a subsidiary of
Matthews International Corporation ("Matthews"), acquired Milso
Industries, Inc. ("Old Milso").  Old Milso was a Brooklyn-based,
family-owned company that for decades had been in the business of
manufacturing, marketing, selling and delivering caskets and
other funeral-related items to funeral homes.  Old Milso had a
well-established marketing, sales and distribution network and an
experienced sales team.  Old Milso was owned and operated by
several members of the Pontone family, including Scott Pontone,
Vice President of Operations ("Pontone").  Nazzaro and Larkin
served as sales representatives of Old Milso (and its
predecessors-in-interest), operating in Connecticut and in New
England generally.

York and Midnight Acquisition Corporation acquired the
assets of Old Milso and certain related entities, pursuant to an
Asset Purchase Agreement dated May 28, 2005 (the "APA"), for $110
million.  In connection with the acquisition, Midnight
Acquisition Corporation changed its name to "Milso Industries
Corporation."  Section 2.12 of the APA provided that the
purchased assets included certain "Assumed Contracts."  The
"Assumed Contracts" in Schedule 2.1.2A to the APA included
thirty-three employment agreements with Old Milso's employees,

each of which contained confidentiality, non-solicitation and non-compete provisions enforceable for 18 months after termination of employment.

Old Milso had entered into these employment agreements in or around March 2003.  Nazzaro and Larkin entered into their employment agreements with Old Milso (the "Employment Agreements") on March 11, 2003.  Pontone signed the Agreements on behalf of Old Milso.  The Employment Agreements provide that they are to be construed under New York law, contain merger clauses, and are silent as to assignability.  The parties dispute the intent of Old Milso, Nazzaro, and Larkin as to assignability at the time they entered into the Employment Agreements.

On June 29, 2005, York sent a letter to Old Milso's employees (the "June 29th Letter") informing them of the imminent acquisition, advising them that their employment would be terminated upon the closing, and offering to re-hire them as employees of the new company, Milso.  The letter read as follows:

> As you know, we expect to complete a combination of the Milso and York businesses shortly.  We are excited about the combination, which we believe will create benefits and opportunities for Milso's customers and employees.
>
> We would like you to continue to work in the enlarged business.  Because of the way the transaction has been structured, we intend to accomplish this by having your existing employment terminate at the closing of the Milso and York transaction and then arrange for you to be re-hired by the corporation that

is acquiring the Milso business and assets. That corporation's name (presently "Midnight Acquisition Corporation") will be Milso Industries Corporation.

This letter is our formal offer to re-hire you in the way described above. If you accept our offer, your cash compensation will be no less than your current cash compensation. In addition, the other terms of employment we are offering are substantially similar in the aggregate to the terms of your current employment.

To accept this offer, please sign and return this letter in the space provided below and return it to us in the self-addressed stamped envelope. By signing this letter and accepting our offer of employment on the terms described above, you agree to remain subject to the terms and conditions set forth in the At-Will Employment, Non-Disclosure and Non-Competition Agreement, a copy of which is attached hereto, and that we shall be the "Company" under the Agreement.

We look forward to your ongoing contributions to the success of the combined Milso and York businesses.

Aff. Sara R. Simeonidis Supp. Defs.' Mot. Summ. J. (Doc. No. 124) ("Simeonidis Aff."), Ex. 4.)

Neither Nazzaro nor Larkin signed the June 29th Letter. However, after the closing pursuant to the APA, both worked for Milso for substantially the same wages and benefits until 2008.

Milso contends that during this time it maintained the confidentiality of the following customer and financial information: customer lists, customer contact information, customer preferences with respect to sales and marketing contracts,

discounts offered to customers, distribution of casket sales and price points and cost structures concerning Milso's products. To protect this "confidential" information, Milso entered into confidentiality agreements with business parties, acquisition targets, other companies and employees. Milso also contends, and the defendants dispute, that funeral home customers expressly agreed that Milso's costs and terms (including discounts) are confidential. The defendants contend that much of this "confidential" information is publicly available and can be determined by reference to the yellow pages, trade publications or Milso's price list or by asking Milso's customers.

In February 2008, Nazzaro and his close friend Boggia conceived an idea for a new casket business. At that time, Boggia's only experience in the death care industry was working for his father, a casket salesmen, in the 1970s and early 1980s, when Boggia was a young man and had not yet graduated from college. Immediately prior to February 2008, Boggia was a construction consultant. Nazzaro assisted Boggia in drafting a business plan, which would be used in order to secure financing. The business plan for the new business--the Liberty Casket Company--was finalized on March 14, 2008. The business plan represented that Nazzaro was the "Director of Sales and Business Development" of Liberty, which would "use the market changing experience of Edward Nazzaro." On March 17, 2008, Boggia filed the papers to form Liberty as a

Connecticut corporation.

For a period of time, Liberty imported metal caskets from China for sale to its customers. These imported models were indicated with a "C" on the Liberty price list. It is undisputed that Milso also sells foreign-manufactured metal caskets, which in Milso's case are made in Mexico. Milso offers a study by Hal Poret in which he concludes that casket consumers' purchasing decisions vary depending on whether the words "Made in China" are on the catalog pages they review.

Milso contends that in March, April and early May 2008, Nazzaro communicated and e-mailed about the new business, and used his paid vacation time from Milso to visit suppliers to negotiate agreements and place orders for caskets on behalf of Liberty. It contends that in May 2008, Nazzaro ordered a customized delivery truck, negotiated warehouse space, ordered dollies, arranged for invoicing software, and developed and priced the Liberty logo. Liberty's logo is the Statue of Liberty wrapped in the American flag, and both Liberty's logo and its promotional materials are red, white and blue. The defendants contend that Nazzaro provided only minimal assistance and did so during his own time.

Nazzaro resigned from Milso on May 19, 2008 and became a Liberty employee and salesperson. Liberty announced its formation on June 8, 2008 and sold its first caskets in the summer of 2008. Nazzaro sold caskets on behalf of Liberty to many of his customers

from his time at Milso.  Nazzaro also created a price comparison sheet that directly compared Milso products and Liberty products, with prices and percent comparisons.

In July 2008, Milso filed this action against Nazzaro and Liberty.  Sometime thereafter, Boggia contacted Larkin to offer him employment at Liberty.  Larkin resigned from Milso on October 7, 2008 and accepted employment with Liberty one week later.  Larkin then sold caskets on behalf of Liberty to many of his customers from his time at Milso.  Milso amended the complaint and added Boggia and Larkin as defendants.

## II.  LEGAL STANDARD

A motion for summary judgment may not be granted unless the court determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the moving party as a matter of law.  Fed. R. Civ. P. 56(c).  See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Gallo v. Prudential Residential Servs., 22 F.3d 1219, 1223 (2d Cir. 1994).  When ruling on a motion for summary judgment, the court may not try issues of fact, but must leave those issues to the jury.  See, e.g., Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); Donahue v. Windsor Locks Bd. of Fire Comm'rs, 834 F.2d 54, 58 (2d Cir. 1987).  Thus, the trial court's task is "carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them.  Its

duty, in short, is confined . . . to issue-finding; it does not extend to issue-resolution." Gallo, 22 F.3d at 1224.

Summary judgment is inappropriate only if the issue to be resolved is both genuine and related to a material fact. Therefore, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. An issue is "genuine . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248 (internal quotation marks omitted). A material fact is one that would "affect the outcome of the suit under the governing law." Anderson, 477 U.S. at 248. Only those facts that must be decided in order to resolve a claim or defense will prevent summary judgment from being granted. Immaterial or minor facts will not prevent summary judgment. See Howard v. Gleason Corp., 901 F.2d 1154, 1159 (2d Cir. 1990).

When reviewing the evidence on a motion for summary judgment, the court must "assess the record in the light most favorable to the non-movant and . . . draw all reasonable inferences in its favor." Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000) (quoting Delaware & Hudson Ry. Co. v. Consol. Rail Corp., 902 F.2d 174, 177 (2d Cir. 1990)). However, the inferences drawn in favor of the nonmovant must be supported by the evidence. "[M]ere speculation and conjecture" is insufficient to defeat a motion for

9

summary judgment.  <u>Stern v. Trs. of Columbia Univ.</u>, 131 F.3d 305, 315 (2d Cir. 1997) (quoting <u>W. World Ins. Co. v. Stack Oil, Inc.</u>, 922 F.2d 118, 121 (2d. Cir. 1990)).  Moreover, the "mere existence of a scintilla of evidence in support of the [nonmovant's] position" will be insufficient; there must be evidence on which a jury could "reasonably find" for the nonmovant.  <u>Anderson</u>, 477 U.S. at 252.

## III. DISCUSSION

### A.  Breach of Contract (First Cause of Action)

Milso claims in the First Cause of Action that Nazzaro and Larkin breached the restrictive covenants in their Employment Agreements with Old Milso--Nazzaro by helping to establish a rival casket company, and both by soliciting Milso's clients.  The defendants contend that Milso cannot enforce the Employment Agreements because (i) the employment of Nazzaro and Larkin was terminated by the June 29th Letter, and they were re-hired by Milso as at-will employees and the Employment Agreements have expired and are unenforceable; and (ii) the restrictive covenants in the Employment Agreements are in any event unreasonable and thus unenforceable.  The plaintiff contends that the Employment Agreements are enforceable, the restrictive covenants are reasonable and that Nazzaro and Larkin breached the Employment Agreements, causing Milso to suffer damages.

The parties agree that the choice of law provision in the

Employment Agreements governs.  The Employment Agreements provide that New York law will control any disputes arising out of the contract.

      **1.**    **The June 29th Letter Did Not Render the Employment Agreements Unenforceable**

The defendants contend that because the June 29th Letter terminated the employment of Nazzaro and Larkin and they never counter-signed their letters, the Employment Agreements expired and when they worked for Milso it was as at-will employees.  Thus, they argue, the restrictive covenants expired 18 months after June 29, 2005.  In support of this argument, the defendants rely on SIFCO Indus., Inc. v. Advanced Plating Techs., Inc., 867 F. Supp. 155, 158-59 (S.D.N.Y. 1994).  In SIFCO, the plaintiff corporation had recently acquired the assets of another corporation.  It brought suit against terminated employees of the acquired business for breaching the covenants not to compete in their employment agreements with the acquired business.  As in this case, the employment agreements were expressly assigned to the plaintiff upon its purchase of the other corporation's assets.  Nevertheless, the court held that SIFCO could not enforce the non-compete provisions.

The defendants cite SIFCO for the proposition that an acquiring company cannot enforce covenants not to compete in the employment agreements the acquired business had with its employees if their employment was terminated.  However, SIFCO is

distinguishable.   In <u>SIFCO</u> the employees were terminated by a
letter from the business being acquired, not a letter from the
acquiring corporation, <u>i.e.</u> SIFCO, and SIFCO offered the defendants
consulting positions that expressly avoided creating an employment
relationship, but also conditioned the consulting arrangements on
modification of the terms of the confidentiality agreements that
had been in place between the defendants and the acquired business.
The court held that the agreements were not enforceable because the
plaintiff made no showing that "it made a firm offer to each
defendant of continued employment in a position comparable in
salary, benefits, responsibility, and location to the employee's
previous position."   <u>Id.</u> at 158.   Rather, the defendants "were
involuntarily terminated . . . and none of the actions taken by
SIFCO subsequent to that date altered the fact of that
termination."   <u>Id</u>. at 159.

Here, the June 29th Letter simultaneously terminated Nazzaro
and Larkin's employment with Old Milso as of the date of the
closing and also offered each of Nazzaro and Larkin a position with
Milso with essentially the same salary and benefits.   The letter
stated that those who accepted the offer to be re-hired would
receive terms of employment that "are substantially similar in
aggregate to the terms of [their] current employment," including
"cash compensation . . . no less than . . . current cash

compensation." (Simeonidis Aff., Ex. 4.) These terms constitute the "firm offer" of "continued employment in a position comparable . . to the employee's previous position" that was absent in <u>SIFCO</u>. <u>See</u> <u>SIFCO</u>, 867 F. Supp. at 158.

The court in <u>SIFCO</u> echoed a concern voiced in <u>Post v. Merrill Lynch, Pierce, Fenner & Smith, Inc.</u>, 397 N.E.2d 358 (N.Y. 1979), where the court held that an employer could not enforce a restraint on an employee's mobility after terminating his employment. The court in <u>Post</u> reasoned that "[a]n employer should not be permitted to use offensively an anticompetition clause . . . to economically cripple a former employee and simultaneously deny other potential employers his services." <u>Id</u>. at 361.

Thus, under New York law, a non-competition provision in an employment agreement can be enforced after the employment agreement is assigned, despite the termination of employment, if the employee is given an offer of comparable continuous employment. <u>See</u> <u>Post</u>, 397 N.E.2d at 360-61 ("An essential aspect [of enforceable restraints on employee mobility] is the employer's continued willingness to employ the party covenanting not to compete.").

**2.   The Assignability of the Employment Agreements Depends on the Intent of the Parties to the Employment Agreements**

The parties disagree as to whether the Employment Agreements were assignable from Old Milso to Milso despite the absence of an

13

express assignability clause.

In general, employment agreements containing non-competition provisions, as opposed to personal services contracts, are assignable under New York law.  See Eisner Computer Solutions, LLC v. Gluckstern, 741 N.Y.S.2d 511, 511 (1st Dept. 2002).  In addition, under New York law, "an express assignment to a subsequent purchaser of the covenant not to compete is unnecessary. A subsequent sale of the business will pass the covenant as an incident of the goodwill of the business even though it is not expressly assigned."  Aquavella v. Viola, No. 2002/06929, 2006 WL 3232167, *1 (N.Y. Sup. Sept. 25, 2006) (citing 6A N.Y. Jur. 2d Assignments § 14 (March 2006 Update)).

If there is no express assignment, however, the assignability of such an employment agreement depends on the intent of the parties to that agreement.  See Archer Worldwide, Inc. v. Mansbach, 734 N.Y.S.2d 869, 869 (2d Dept. 2001) (affirming the trial court's determination that an employment agreement was unenforceable on the ground that "there was no evidence the parties intended the agreement to be assignable when it was originally executed."); Abalene Pest Control Serv., Inc. v. Powell, 187 N.Y.S.2d 381, 383 (2d Dept. 1959) ("Whether or not the covenants by appellant not to compete with respondent's assignor after the termination of his employment, were assignable, without his consent, depends on the intention of the parties in entering into the agreement."); ENV

14

<u>Servs., Inc. v. Alesia</u>, No. 11777-04, 2005 WL 3240478, at *6 (N.Y. Sup. Nov. 28, 2005) (granting summary judgment to defendants because, <u>inter alia</u>, "[t]here is no evidence that the parties intended the employment agreements to be assignable when they were originally executed.").

In this case, there is no assignability clause, so the assignability of the Employment Agreements between Old Milso and each of Nazzaro and Larkin depends on the intent of the parties.[1] The parties dispute whether Larkin and Nazzaro negotiated that the Employment Agreements would not be assignable, and each side has provided evidence in support of its position. Thus, there are

_____

[1]Milso contends that extrinsic evidence of intent is barred by New York's parol evidence rule because (a) the Employment Agreements contain merger clauses providing that the Employment Agreement supersedes "all prior employment agreements addressing the terms, conditions, and issues contained herein" (Simeonidis Aff., Ex. 1 - At-Will Employment Nondisclosure and Non-Competition Agreement, ¶ 18), (b) there are no references in the Employment Agreements to a bar of assignability, and (c) the contracts themselves are unambiguous and that prevents the defendants from inserting a provision that would bar the assignment of the Employment Agreements. Milso properly cites <u>Wallace Steel, Inc. v. Ingersoll-Rand Co.</u>, 739 F.2d 112, 115 (2d Cir. 1984) for the proposition that "[t]he parol evidence rule provides in substance that, where the parties have reduced their agreement to writing, evidence of prior or contemporaneous agreement may not be offered to contradict, vary, or subtract from the terms of the writing." However, here the terms of the writing do not address the question of assignability so evidence of intent as to assignability does not contradict, vary, or subtract from the terms in the writing. Therefore, in light of <u>Archer</u>, <u>Abalene</u>, and <u>ENV Servs.</u>, the court finds Milso's argument unpersuasive. In addition, Milso relies on language from <u>Special Prods. Mfg., Inc. v. Douglass</u>, 553 N.Y.S.2d 506, 509 (3d Dept. 1990) (stating that "[b]ecause executory contracts, which do not involve exceptional personal skills on the part of the assignor and which the assignee can perform without adversely affecting the rights and interests of the adverse party, are freely assignable absent a contractual, statutory or public policy prohibition . . . . , a clear and unambiguous prohibition is essential to effectively prevent assignment." (citations omitted)). However, in <u>Douglass</u>, the court also stated that "[w]hen the original parties to an agreement so intend, a covenant not to compete is freely assignable." <u>Id.</u> (citing <u>Abalene</u>).

genuine issues of material fact as to the parties' intent with respect to assignability and Milso can not show that it is entitled to summary judgment on the breach of contract claim.

### 3.   Reasonableness of the Restrictive Covenants

"Restrictive covenants are judged by the standard of reasonableness as demonstrated in a three-prong test[,] to wit: if the covenant (1) is no greater than is required for the protection of the legitimate interest of the employer; (2) does not impose undue hardship on the employee; and (3) is not injurious to the public. BDO Seidman v. Hirschberg, 93 N.Y.2d 382, 388-89, 690 N.Y.S.2d 854, 712 N.E.2d 1220 (1999)." ENV Servs., 2005 WL 3240478, at *4. "The cognizable employer interests under the first prong is limited to misappropriation of the employer's trade secrets or confidential client lists, or protection from competition by a former employee whose services are unique or extraordinary." Id. (citations omitted).

The defendants contend that Milso cannot enforce the covenants in the Employment Agreements because it has no legitimate protectable interest in that it has no protectable trade secrets and its customer and pricing information is not confidential. The plaintiff disputes this contention. Each side has produced evidence in support of its position so there are genuine issues of material fact as to whether Milso has a legitimate protectable interest and the restrictive covenants are reasonable. Therefore,

16

the defendants cannot show that they are entitled to summary judgment on the breach of contract claim.  Therefore, both motions for summary judgment on the claim for breach of contract are being denied.

### B.  Misappropriation of Trade Secrets under CUTSA (Second Cause of Action)

Milso claims in its Second Cause of Action that all the defendants misappropriated its trade secrets in violation of CUTSA. "In the absence of clear consent or waiver by the principal, an agent, during the term of the agency, is subject to a duty not to compete with the principal concerning the subject matter of the agency.  3 C.J.S., Agency, § 143; Restatement (Second), 2 Agency § 393."  Town & Country House & Homes Serv, Inc. v. Evans, 150 Conn. 314, 317 (1963).  "Upon termination of the agency, however, and in the absence of a restrictive agreement, the agent can properly compete with his principal in matters for which he had been employed."  Id.  Even after the employment has ceased however, "the employee remains subject to a duty not to use trade secrets, or other confidential information which he has acquired in the course of his employment, for his own benefit or that of a competitor to the detriment of his former employer."  Allen Mfg. Co. v. Loika, 145 Conn. 509, 514 (1958).

The plaintiff argues that its customer lists and "business

17

plan"[2] are trade secrets and that Nazzaro and Larkin misappropriated its trade secrets and damaged it. The defendants argue that Milso's customer and pricing information are not trade secrets, there is no proof that Nazzaro and Larkin ever had access to Milso's "business plan," and that Milso never protected its business information as confidential, and that in any event there was no misappropriation by them of Milso's information.[3]

A plaintiff must establish the existence of a trade secret before it can seek protection under CUTSA. The statute defines a trade secret as "information, including a formula, pattern, compilation, program, device, method, technique, process, drawing, cost data or customer list that: (1) [d]erives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." Conn. Gen. Stat. § 35-

---

[2]The plaintiff asserts that "Nazzaro and Larkin, because they had worked for Milso for many years, were intimately aware of additional Milso trade secrets that constituted Milso's confidential 'business plan': the nature of its business, information about its distribution network, discounts and pricing given to customers, price points and margins on Milso's products, inventory buying patterns, and confidential information concerning Milso's suppliers." (Mem. Law Supp. Pl. Milso Indus. Corp.'s Mot. Summ. J. (Doc. No. 129-1) ("Pl.'s Br."), 33-34.)

[3]The court notes that one point not raised by the parties, and therefore not addressed by the court, is the fact that CUTSA "supersede[s] any conflicting tort, restitutionary, or other law of this state pertaining to civil liability for misappropriation of a trade secret." Conn. Gen Stat. § 35-57(a); see also Nora Beverages, Inc. v. Perrier Grp. Of Am., Inc., 164 F.3d 736 (2d Cir. 1998) ("The district court correctly found that CUTSA preempts any tort remedy for misuse of trade secrets.").

51(d).  "The three part statutory test for the definition of a
trade secret therefore requires that the information: (1) be of the
kind included in the nonexhaustive list contained in the statute;
(2) be 'of independent economic value'; and (3) 'was the subject of
reasonable efforts to maintain its secrecy.'"  Dreamcatcher
Software Dev., LLC v. Pop Warner Little Scholars, Inc., 298 F.
Supp. 2d 276, 282 (D. Conn. 2004) (quoting Elm City Cheese Co. v.
Federico, 251 Conn. 59, 78 (1999)).  The question of whether
information sought to be protected rises to level of a trade secret
under CUTSA is a question of fact.  See id. at 282; Elm City
Cheese, 251 Conn. at 68; Allen, 145 Conn. at 516.

     With respect to the first prong, there is no genuine issue as
to whether Milso's customer lists and "business plan" are
information of the kind included in the nonexhaustive list in § 35-
51(d).  Although customer lists are on the "periphery of the law
of trade secrets," Air Support, Inc. v. Acuna, No. CV 950148386S,
1996 WL 362097, at *3 (Conn. Super. May 29, 1996), courts have
frequently held that customer lists and pricing information are
deserving of trade secret protection.  See, e.g., Town & Country
House & Home Serv., 150 Conn. at 319 ("A list of customers, if
their trade and patronage have been secured by years of business
effort and advertising and the expenditure of time and money,
constitutes an important part of a business and is in the nature of
a trade secret."); Triangle Sheet Metal Works, Inc. v. Silver, 154

19

Conn. 116, 126 (1966) ("[F]inancial details of [plaintiff's] costs, pricing, and bidding . . . fully meet the definition of trade secrets . . . ."). Therefore, Milso's customer lists and "business plan" satisfy the first prong of the statutory test for a trade secret.

With respect to the second prong, there are genuine issues of material fact as to whether Milso's customer lists and "business plan" are of independent economic value. The plaintiff has provided evidence that its customer lists were carefully vetted and maintained lists of private contact information, cell phone numbers and e-mails that would not be retrievable by public means, or would require significant resources to duplicate, and evidence as to the economic value of its "business plan." On the other hand, the defendants have provided evidence that Milso's customer lists and "business plan" are comprised of information that is publicly available or readily ascertainable, inter alia, because listings of area funeral homes are publicly available; the funeral home directors on Milso's customer lists were long-time personal friends of Nazzaro and Larkin, whose relationships with these individuals predate their employment by Old Milso; and Milso's customers are free to share Milso's price list, the volume and types of caskets purchased, and discounts received from Milso. Compare Holiday Food Co., Inc. v. Munroe, 37 Conn. Supp. 546, 553 (1981) (customer list not a trade secret where the customers "were [former employee's]

friends as well as potential clients"), <u>with</u> <u>Dreamcatcher Software</u> <u>Dev.</u>, 298 F. Supp. 2d at 282 ("An alleged secret is not deprived of trade secrets simply because it is comprised of materials that are "common [and] commercially available.") (quoting <u>Elm City Cheese</u> <u>Co.</u>, 251 Conn. at 74).

With regard to the third prong, there are also genuine issues of material fact as to whether Milso made reasonable efforts to maintain the secrecy of its customer lists and pricing information. "The question of whether . . . a party has made reasonable efforts to maintain the secrecy of a purported trade secret is by nature a highly fact-specific inquiry." <u>Elm City Cheese</u>, 251 Conn. at 80. Reasonable efforts to maintain secrecy include "requiring employees to sign confidentiality agreements or otherwise advising them of the confidential nature of the process; posting of warning or cautionary signs, or placing legends on documents; taking precautions regarding visitors, by requiring them to sign confidentiality agreements, having them sign in, and shielding the process from their view; segregating information, so that no one person or written source discloses the entire manufacturing process; and using unnamed or coded ingredients." 1 R. Milgrim, Trade Secrets (1999) § 1.04, 1-178 through 1-189.

The plaintiff has provided evidence as to the employment agreements it entered into with employees other than Larkin and Nazzaro, as well as confidentiality agreements it entered into with

business parties and prospective business partners.  On the other hand, each of Nazzaro and Larkin avers that, in his experience, Milso's customers are under no obligation to protect information relating to pricing, discounts or payment terms and that customers often share this information to obtain a better deal from competing casket companies, and Pontone testified that he never had any trouble obtaining information from a customer about the discount he or she was paying.  (Simeonidis Aff., Ex. 12 - Dep. of Scott Pontone, 117.)

In addition, genuine issues of material fact exist as to whether there was a misappropriation of any of Milso's information that constitutes trade secrets under CUTSA.  Therefore, both motions for summary judgment on the CUTSA claim are being denied.

### C. Breach of Fiduciary Duties (Third Cause of Action)

Milso claims in the Third Cause of Action that Larkin and Nazzaro breached their fiduciary duties to Milso, including the duty of loyalty.  Milso has moved for summary judgment on this claim as to Nazzaro, and Larkin and Nazzaro have also moved for summary judgment on this claim.

"The essential elements to pleading a cause of action for breach of fiduciary duty under Connecticut law are: (1) That a fiduciary relationship existed which gave rise to (a) a duty of loyalty on the part of the defendant to the plaintiff, (b) an obligation on the part of the defendant to act in the best

interests of the plaintiff, and (c) an obligation on the part of the defendant to act in good faith in any matter relating to the plaintiff; (2) That the defendant advanced his or her own interests to the detriment of the plaintiff; (3) That the plaintiff has sustained damages; and (4) That the damages were proximately caused by the fiduciary's breach of his or her fiduciary duty."   T. Merritt, 16 Connecticut Practice Series: Elements of an Action § 8.1 (2010-2011 Ed.).

### 1.  <u>Larkin</u>

With respect to Larkin, Milso fails to identify in its opposition any conduct by him that would amount to a breach of fiduciary duty.  It is undisputed that Larkin was not involved in Liberty's formation, that he never solicited any customer for Liberty or informed any customer of his plans to work for Liberty prior to resigning from Milso, and that he resigned from Milso on October 7, 2008, accepted Liberty's offer of employment three days later, and did not solicit customers for Liberty until November 2008.  Therefore, the defendants' motion for summary judgment as to the claim of breach of fiduciary duties with respect to Larkin is being granted.

### 2.  <u>Nazzaro</u>

With respect to Nazzaro, the plaintiff contends that Nazzaro breached his fiduciary duties to Milso both while he was employed by Milso and after his resignation.   "In the absence of clear

consent or waiver by the principal, an agent, during the term of the agency, is subject to a duty not to compete with the principal concerning the subject matter of the agency. 3 C.J.S., Agency, § 143; Restatement (Second), 2 Agency § 393." Town & Country House & Homes Serv., 150 Conn. at 317.

Before the end of his employment, an employee "can properly purchase a rival business and upon termination of employment immediately compete.  He is not, however, entitled to solicit customers for such rival business before the end of his employment . . . in direct competition with the employer's business." Id. (quoting Restatement (Second) of Agency § 393 cmt. 3); see also Mec-Gar, S.R.L. v. Hard, No. CV020077396S, 2002 WL 31440778 (Conn. Super. Oct. 2, 2002) (finding that defendant breached his fiduciary duty where defendant solicited plaintiff's customer while still employed by plaintiff).  In addition, "[k]nowledge acquired by an employee during his employment cannot be used for his own advantage to the injury of the employer during employment." Town & Country House & Home Serv., 150 Conn. at 317 (citations omitted).

"The limits of proper conduct with reference to securing the services of fellow employees are not well marked." Custard Ins. Adjusters, Inc. v. Nardi, No. CV980061967S, 2000 WL 562318, at *22 (Conn. Super. Apr. 20, 2000).  However, in Elec. Assocs., Inc. v. Automatic Equip. Dev. Corp., 185 Conn. 31, 36 (1981), the court concluded that "[o]nce Merritt left the plaintiff's employment, no

24

fiduciary duty restrained him from using ordinary methods to encourage his former coworkers or subordinates to follow him to its competitor."

Finally, "after the employment has ceased the employee remains subject to a duty not to use trade secrets, or other confidential information which he has acquired in the course of his employment, for his own benefit or that of a competitor to the detriment of his former employer." <u>Allen</u>, 145 Conn. at 514.

Here, genuine issues of material fact exist as to whether Nazzaro breached his fiduciary duty of loyalty while he was employed by Milso by, <u>inter alia</u>, soliciting customers for Liberty or otherwise competing with Milso before the end of his employment by Milso, and using knowledge acquired by him during his employment by Milso to his own advantage to the injury of Milso, and also as to whether Nazzaro breached the duty of loyalty after his resignation by, <u>inter alia</u>, employing methods other than ordinary methods to encourage Larkin to resign and go to work for Liberty, and using confidential information he acquired in the course of his employment by Milso for his own benefit or the benefit of Liberty, to the detriment of Milso.

Therefore, both motions for summary judgment on the claim for breach of fiduciary duties with respect to Nazzaro are being denied.

**D.  Aiding and Abetting Breach of Fiduciary Duty (Fourth Cause of Action)**

25

Milso claims in the Fourth Cause of Action that Boggia and Liberty aided and abetted alleged breaches of fiduciary duties by Nazzaro and Larkin. Milso has moved for summary judgment with respect to the part of the claim that relates to aiding and abetting Nazzaro, and the defendants have moved for summary judgment as to the entire claim.

To prevail on a claim for aiding and abetting a breach of fiduciary duty under Connecticut law, a plaintiff must show "(1) a wrong by the primary violator or principal; (2) knowledge of that wrong by the alleged aider and abettor; and (3) substantial assistance to the principal by the aider and abettor in achievement of the primary violation." Harris v. Wells, Civ. Nos. B-89-391 (WWE), B-89-482 (WWE), 1991 WL 23535, at *2 (D. Conn. Feb. 6, 1991).

To satisfy the first requirement, Milso must prove an underlying tort. See Master-Halco, Inc. v. Scillia Dowling & Natarelli, 739 F. Supp. 2d 109, 121 (D. Conn. 2010) ("[I]t goes without saying that individuals cannot aid and abet themselves."). As to Larkin, summary judgment has been granted in his favor as to the underlying tort, so Milso can not establish that Boggia and/or Liberty aided and abetted Larkin. As to Nazzaro, the defendants argue that the aiding and abetting claim fails because the breach of fiduciary duties claim fails. However, genuine issues of material fact exist as to whether Nazzaro breached his fiduciary

duties to Milso.

Therefore, the defendants' motion for summary judgment as to the aiding and abetting breach of fiduciary duties claim against Boggia and Liberty is being granted insofar as it relates to aiding and abetting Larkin and denied insofar as it relates to Nazzaro, and the plaintiff's motion for summary judgment on the aiding and abetting of fiduciary duties claim is being denied.

**E.  Unjust Enrichment (Fifth Cause of Action)**

Milso claims in the Fifth Cause of Action that all the defendants received benefits for which they unjustly did not pay by improperly soliciting Milso's clients, customers, employees, and other business relations, and by utilizing Milso's confidential and proprietary information and trade secrets.  To prevail on a claim of unjust enrichment, a plaintiff must prove: "(1) that the defendants were benefitted, (2) that the defendants unjustly did not pay the plaintiffs for the benefits, and (3) that the failure of payment was to the plaintiffs' detriment." Jo-Ann Stores, Inc. v. Prop. Operating Co., 91 Conn. App. 179, 194 (2005) ("[R]ight of recovery under the doctrine of unjust enrichment is essentially equitable, its basis being that in a given situation it is contrary to equity and good conscience for one to retain a benefit which has come to him at the expense of another.").  "Unjust enrichment is a very broad and flexible equitable doctrine that has as its basis the principle that it is contrary to equity and good conscience for

27

a defendant to retain a benefit that has come to him at the expense of the plaintiff."  Gagne v. Vaccaro, 255 Conn. 390, 409 (2001).

The defendants argue that they are entitled to summary judgment as to this claim because it is entirely predicated on the plaintiff's trade secrets claim, which they contend fails. However, the unjust enrichment claim is not entirely predicated on any trade secrets claim, and in any event the plaintiff's CUTSA claim survives summary judgment.  In addition, genuine issues of material fact exist, inter alia as to whether the defendants unjustly did not pay the plaintiff for benefits.  Therefore, both motions for summary judgment on the claim for unjust enrichment are being denied.

   **F.   Tortious Interference with Contractual Relations (Sixth Cause of Action**

Milso claims in the Sixth Cause of Action that Liberty and Boggia tortiously interfered with the contractual relationship that existed between Nazzaro and Milso in the form of Nazzaro's Employment Agreement, and that Nazzaro, Liberty and Boggia tortiously interfered with the contractual relationship that existed between Larkin and Milso in the form of Larkin's Employment Agreement.

In Robert S. Weiss & Assoc., Inc. v. Wiederlight, the court observed:

   "'This court has long recognized a cause of action for tortious interference with contract rights or other

28

business relations. (Citations omitted.) <u>Blake v. Levy</u>,
191 Conn. 257, 260, 464 A.2d 52 (1983).'" <u>Solomon v.</u>
<u>Aberman</u>, 196 Conn. 359, 364, 493 A.2d 193 (1985).
Nevertheless, "not every act that disturbs a contract or
business expectancy is actionable. <u>Jones v. O'Connell</u>,
[189 Conn. 648, 660-61, 458 A.2d 355 (1983).]." <u>Blake v.</u>
<u>Levy</u>, supra, 191 Conn. at 260-61, 464 A.2d 52.

208 Conn. 525, 535-36 (1988).

In order to prove a claim for tortious interference with
contractual relations, a plaintiff must establish "(1) the
existence of a contractual or beneficial relationship, (2) the
defendants' knowledge of that relationship, (3) the defendants'
intent to interfere with the relationship, (4) the interference was
tortious, and (5) a loss suffered by the plaintiff that was caused
by the defendants' tortious conduct." <u>Appleton v. Bd. of Educ. of</u>
<u>Town of Stonington</u>, 254 Conn. 205, 212-13 (2000) (citations
omitted).

In <u>Wiederlight</u>, the court stated with respect to the fourth
element:

> "'[F]or a plaintiff successfully to prosecute such an
> action it must prove that the defendant's conduct was in
> fact tortious.  This element may be satisfied by proof
> that   the   defendant   was   guilty   of   fraud,
> misrepresentation, intimitation or molestation . . . or
> that the defendant acted maliciously.'. . . "[A]n action
> for intentional interference with business relations . .
> . requires the plaintiff to plead and prove at least some
> improper motive or improper means. . . . '[A] claim is
> made out [only] when interference resulting in injury to
> another is wrongful by some measure beyond the fact of
> the interference itself.'"

<u>Wiederlight</u>, 208 Conn. at 536 (internal citations omitted).

<u>Wiederlight</u> also involved a claim of interference with a

29

restrictive covenant:

> The third count of the plaintiff's amended complaint alleged that IAC "knew or in the exercise of reasonable care should have known" of the restrictive covenant in the Wiederlight-Weiss agreement and that, "[d]espite this knowledge either actual or constructive," IAC encouraged Wiederlight to sell insurance in violation of the agreement to IAC's financial benefit.  The third count concluded that IAC's activities "constituted an interference with a contractual relationship."

Id. at 535.  The court concluded that "[t]he assertion that IAC 'encouraged' Wiederlight to sell commercial insurance in the restricted area when it knew or should have known of the covenant's term does not fairly imply that IAC acted with 'fraud, misrepresentation, intimidation or molestation' or that it acted with malice."  Id. at 536 (quoting Blake v. Levy, 191 Conn. at 261).

Here, in response to the defendants' argument that the plaintiff has not produced evidence that interference with the Employment Agreements was tortious, the plaintiff argues that the defendants' conduct was tortious "as they knew that the competing employment would immediately injure Milso by diverting existing accounts serviced by Nazzaro and Larkin from Milso to Liberty." (Pl.'s Br. 43.)  However such knowledge shows only that the defendants knew that they would be taking business away from Milso, which would be in the normal course because they were competing with Milso; such knowledge does not fairly imply that the defendants acted with fraud, misrepresentation, intimidation or

30

molestation or that they acted with malice.

Therefore, the defendants' motion for summary judgment on the claim for interference with contractual relations is being granted, and the plaintiff's motion is being denied.

### G.   Interference with Business Expectancies (Seventh Cause of Action)

Milso claims in the Seventh Cause of Action that all the defendants tortiously interfered with its business expectancies, i.e., its relationships with customers.   In order to maintain a claim for interference with business expectancies, Milso must establish "(1) a business relationship between the plaintiff and another party; (2) the defendant's intentional interference with the business relationship while knowing of the relationship; and (3) as a result of the interference, the plaintiff suffers actual loss." Hi-Ho Tower, Inc. v. Com-Tronics, Inc., 255 Conn. 20, 27 (2000).   In Biro v. Hirsch, the court explained:

> The plaintiff need not prove that the defendant caused the breach of an actual contract; proof of interference with even an unenforceable promise is enough. . . . A cause of action for tortious interference with a business expectancy requires proof that the defendant was guilty of fraud, misrepresentation, intimidation or molestation . . . . The plaintiff is required to plead and prove at least some improper motive or improper means.

62 Conn. App. 11, 21 (2001) (citations and quotation marks omitted).   "[T]o substantiate a claim of tortious interference with a business expectancy, there must be evidence that the interference resulted from the defendant's commission of a tort." Id. at 22

(citations and quotation marks omitted).  Here the defendants contend that the plaintiff has not produced evidence that the interference resulted from the commission of a tort by one or more of the defendants.  However, the plaintiff has produced evidence that creates genuine issues of material fact, <u>inter alia</u>, as to whether the defendants used improper means by misappropriating the plaintiff's trade secrets to solicit customers for Liberty.

Therefore, both motions for summary judgment on the claim for tortious interference with business expectancies are being denied.

### H.   CUTPA (Eighth Cause of Action)

Milso claims in the Eighth Cause of Action that all the defendants' conduct constitutes unfair competition in violation of CUTPA.  The court notes that CUTSA and CUTPA claims may both be pursued in the same action.  <u>See, e.g.</u>, <u>Gerner v. Applied Indus. Materials Corp.</u>, No. X08CV020192069S, 2005 WL 1805670 (Conn. Super. June 30, 2005); <u>Matrix Inv. Corp. v. Ward</u>, No. 567613, 2004 WL 2284195 (Conn. Super. Sept. 16, 2004).

CUTPA provides, in relevant part, that "[n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."  Conn. Gen. Stat. § 42-110b(a).  Connecticut courts have adopted the following factors, known as the "cigarette rule," to determine whether a trade practice is unfair or deceptive: "(1) whether the practice, without necessarily having been previously considered

unlawful, offends public policy as it has been established by statutes, the common law, or otherwise-whether, in other words, it is within at least the penumbra of some common-law, statutory, or other established concept of unfairness; (2) whether it was immoral, unethical, oppressive, or unscrupulous; and (3) whether it causes substantial injury to consumers (or competitors or other business men)." De La Concha of Hartford, Inc. v. Aetna Life Ins. Co., 269 Conn. 424, 433-34 (2004). "Whether a practice is unfair and thus violates CUTPA is an issue of fact." Id. at 434 (quoting Ancona v. Manafort Bros., Inc., 56 Conn. App. 701, 714-15, cert. denied, 252 Conn. 953 (2000)).

There are two parts of Milso's CUPTA claim: (a) the claim that the defendants used Milso's confidential information for the start-up of Liberty and then to help Liberty compete with Milso, targeting Milso's Connecticut customer base, and (b) a claim that Liberty deceived its customer base into buying caskets from Liberty instead of Milso, by undercutting Milso's price for its American-made caskets and delivering inferior Chinese-manufactured products, despite Liberty's patriotic logo and marketing materials. Genuine issues of material fact exist, inter alia, as to whether Milso's customer list and "business plan" are comprised of information that is publicly available or readily ascertainable, and as to whether Liberty sold Chinese-made caskets in a manner that constituted unfair competition. Therefore, both motions for summary judgment

33

on the CUTPA claim are being denied.

##### I.   Conversion (Ninth Cause of Action)

Milso claims in the Ninth Cause of Action that all the defendants unlawfully misappropriated and converted confidential and proprietary information for their own personal advantage, including "Milso's customer contacts, purchase histories and discount information, and information concerning Milso's overall business plan and operation." (Pl's Br. 40.) "The tort of '[c]onversion occurs when one, without authorization, assumes and exercises ownership over property belonging to another, to the exclusion of the owner's rights.'" Hi-Ho Tower, 255 Conn. at 43-44 (citing Wellington Sys., Inc. v. Redding Grp., Inc., 49 Conn. App. 152, 169 (1998)) (emphasis omitted). "In Connecticut, intangible property interests have not traditionally been subject to the tort of conversion, except for those intangible property rights evidenced in a document." Id. at 45. See also Froom Dev. Corp. v. Developers Realty, Inc., No. X05CV054004243S, 2007 WL 1470533, at *3 (Conn. Super. Apr. 24, 2007) ("In general, conversion applies to tangible personal property, however, an exception is made where 'intangible property rights are evidenced by a document.'") (quoting Hi-Ho Tower, 255 Conn. at 44).

In support of their motion for summary judgment, the defendants argue that the plaintiff has failed to identify anything that was actually converted by the defendants. In response the

plaintiff maintains only that Nazzaro converted Milso's property when he retained information on his Treo handheld device.  Assuming arguendo that the exception made where intangible property rights are evidenced by a document is properly extended to information on a handheld device, the plaintiff nonetheless has failed to produce evidence as to an essential element of a conversion claim, i.e. that the defendant assumed and exercised ownership over property belonging to another, to the exclusion of the owner's rights.  Milso has produced evidence that could show that Nazzaro retained information to the plaintiff's harm, but Milso has not produced evidence that could show that Nazzaro deprived Milso of its property permanently or for a period of time, or acted in a way that was inconsistent with Milso's right of dominion.  See Deming v. Nationwide Mut. Ins. Co., 279 Conn. 745, 770 (2006) ("Thus, '[c]onversion is some unauthorized act which deprives another of his property permanently or for an indefinite time; some unauthorized assumption and exercise of the powers of the owner to his harm.  The essence of the wrong is that the property rights of the plaintiff have been dealt with in a manner adverse to him, inconsistent with his right of dominion and to his harm.") (quoting Label Sys. Corp. v. Aghamohammadi, 270 Conn. 291, 329 (2004)).  While Nazzaro exercised dominion over the Treo device, it is undisputed that the device was his property.

35

Therefore, the defendants' motion for summary judgment on the conversion claim is being granted, and the plaintiff's motion for summary judgment is being denied.

**J.   Civil Conspiracy (Tenth Cause of Action)**

Milso claims in the Tenth Cause of Action that all the defendants conspired "to unfairly compete with Milso by misappropriating and using Milso's confidential information about its customers, products, pricing and discounts."  (Mem. Law Opp'n Defs.' Mot. Summ. J. (Doc. No. 145) ("Pl.'s Opp."), 29.)   To prevail on a cause of action for conspiracy to commit a tort, or "civil conspiracy," the plaintiff must prove "(1) [a] combination between two or more persons; (2) to do a criminal or an unlawful act or a lawful act by criminal or unlawful means; (3) an act done by one or more of the conspirators pursuant to the scheme and in furtherance of the object; (4) which act results in damage to the plaintiff." Williams v. Maislen, 116 Conn. 433, 437 (1933).

To prove a claim for civil conspiracy, a plaintiff must establish that the underlying acts are wrongful. See Weinberg v. Isom, No. CV 0140152, 1995 WL 785051, at *6 (Conn. Super. Dec. 26, 1995) ("To be legally sufficient the plaintiff must allege that the underlying acts are wrongful.").  Where the party asserting a claim for conspiracy to commit a tort is unable to establish the underlying cause of action, the cause of action for conspiracy also

36

fails.  See Litchfield Asset Mgmt. Corp. v. Howell, 70 Conn. App.
133, 140 (2002), cert. denied, 261 Conn. 911 (2002) (For a
plaintiff to recover on a conspiracy claim, the court must find the
facts necessary to satisfy the elements of an independent
underlying cause of action.  More specifically, where the plaintiff
is unable to establish the underlying cause of action for fraud,
the cause of action for conspiracy to defraud must also fail.)
(citations and quotations omitted).

Under the "intracorporate conspiracy" doctrine, "[e]mployees
of a corporation acting in the scope of their employment cannot
conspire with one another or with the corporation that employs
them; each acts for the corporation and the corporation cannot
conspire with itself." Harp v. King, 266 Conn. 747, 781 (2003)
(quoting Day v. Gen. Elec. Credit Corp., 15 Conn. App. 677, 684
(1988)); see also Hartline v. Gallo, 546 F.3d 95, 99 n.3 (2d Cir.
2008) ("[U]nder the intracorporate conspiracy doctrine, officers,
agents and employees of a single corporate entity are legally
incapable of conspiring together.") (quotation omitted); Herrmann
v. Moore, 576 F.2d 453, 459 (2d Cir. 1978) ("[T]here is no
conspiracy if the conspiratorial conduct challenged is essentially
a single act by a single corporation acting exclusively through its
own directors, officers, and employees, each acting within the
scope of his employment."); Cole v. Univ. of Hartford, 391 F. Supp.

888, 893 (D. Conn. 1975) ("Simply joining corporate officers as defendants in their individual capacities is not enough to make them persons separate from the corporation in legal contemplation."). Thus, Liberty cannot form a conspiracy with its own officers, directors and employees.

Both sides have moved for summary judgment on this claim. In support of its motion, Milso simply makes a conclusory assertion that the defendants acted in concert to commit all the business torts alleged by Milso, but it provides no explanation why there are no genuine issues of material fact as to its contention. Thus, Milso fails to meet its initial burden with respect to summary judgment.

In response to the defendants' argument, in support of their motion for summary judgment, that the civil conspiracy claim fails because of the intracorporate conspiracy doctrine, Milso narrows its claim to the period prior to May 18, 2008, _i.e._ the date Nazzaro resigned from Milso. An argument based on the intracorporate conspiracy doctrine and an argument that the civil conspiracy claim fails because the plaintiff cannot establish the underlying torts are the only arguments the defendants make. However, as discussed above, genuine issues of material fact exist as to certain of the underlying torts.

Therefore, the plaintiff's motion for summary judgment on the

claim for civil conspiracy is being denied, and the defendants'
motion for summary judgment is being granted as to the period
beginning May 18, 2008 and otherwise denied.

   **K.   False Designation of Origin and False Advertising under
         the Lanham Act (Eleventh and Twelfth Causes of Action)**

   Milso claims that Liberty violated § 43(a) of the Lanham Act:
(a) in the Eleventh Cause of Action, because of false designation
of origin, and (b) in the Twelfth Cause of Action, because of false
advertising.

   The Lanham Act's purpose is to "make 'actionable the deceptive
and misleading use of marks,' and 'to protect persons engaged in
... commerce against unfair competition.'"   Dastar Corp. v.
Twentieth Century Fox Film Corp., 539 U.S. 23, 28 (2003) (quoting
15 U.S.C. § 1127).   The Lanham Act was intended "to promote fair
business dealing" and "not to provide a windfall to an overly eager
competitor."   Parkway Baking Co. v. Freihofer Baking Co., 255 F.2d
641, 649 (3d Cir. 1958).

   Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)(1),
provides in pertinent part:

         Any person who, on or in connection with any goods ...
         uses in commerce ... any false designation of origin ...
         which-(A) is likely to cause confusion ... as to the
         origin ... of his or her goods, or (B) in commercial
         advertising  or  promotion,  misrepresents  the  ...
         geographic origin of his or her or another person's goods
         ... shall be liable in a civil action to any person who
         believes that he or she is likely to be damaged by such

39

act.

Subsection (a)(1)(A) creates, <u>inter alia</u>, a "false designation of origin" cause of action, while subsection (a)(1)(B) creates a "false advertising" cause of action.  <u>See Res. Developers, Inc. v. Statue of Liberty-Ellis Island Found., Inc.</u>, 926 F.2d 134, 139 (2d Cir. 1991).  "Falsity may be established by proving that (1) the advertising is literally false as a factual matter, or (2) although the advertisement is literally true, it is likely to deceive or confuse consumers."  <u>NBA v. Motorola, Inc.</u>, 105 F.3d 841, 855 (2d Cir. 1997) (citation omitted).

Milso contends that the manner in which the defendants sell in the United States imported Chinese-made caskets constitutes both false geographic "designation of origin" and, taken with Liberty's iconography, "false advertising" in violation of the Lanham Act.

### 1. <u>Standing</u>

As a threshold issue, the defendants argue that Milso does not have standing to bring its Lanham Act claims.  To establish standing under Section 43(a) of the Lanham Act, Milso must "demonstrate a 'reasonable interest to be protected' against the advertiser's false or misleading claims, and a 'reasonable basis' for believing that this interest is likely to be damaged by the false or misleading advertising.  The 'reasonable basis' prong embodies a requirement that the plaintiff show both likely injury

and a causal nexus to the false advertising." <u>Havana Club Holding,</u>
<u>S.A. v. Galleon S.A.</u>, 203 F.3d 116, 130 (2d Cir. 2000) (citations
omitted).   "[T]he likelihood of injury and causation will not be
presumed, but must be demonstrated." <u>Johnson & Johnson v. Carter-</u>
<u>Wallace, Inc.</u>, 631 F.2d 186, 190 (2d Cir. 1980).

Relying on <u>New Colt Holding Corp. v. RJG Holdings of Florida,</u>
<u>Inc.</u>, 312 F. Supp. 2d 195, 234-35 (D. Conn. 2004), the defendants
argue that a competitor who sells foreign-made goods lacks "likely
injury," and therefore standing, when asserting a false advertising
claim based on designation of origin.   Thus, they contend, because
Milso sells Mexican-made caskets, it lacks standing.

In <u>New Colt</u>, the defendants asserted false designation of
origin and false advertising counterclaims.   The defendants argued
that the plaintiffs' designation of their revolver as "Made in the
USA" was false, and they conducted a consumer survey the results of
which suggested that whether a revolver is of domestic origin is an
important consideration to many firearms purchasers.   The court
held that the defendants failed to demonstrate injury and therefore
lacked standing.   The court reasoned that even if consumers knew
that the plaintiffs' revolvers were of foreign origin, there was no
evidence suggesting that they would necessarily choose to instead
purchase defendants' revolvers, which were also foreign-made.   The
court observed that "Plaintiffs may reap some undue benefit, but at

best this injures other manufacturers whose products are manufactured in the U.S. and not Defendants." Id. at 234.

As in New Colt, in this case the party bringing Lanham Act claims has produced a survey suggesting that consumers prefer products of domestic origin. And, as in New Colt, the party bringing Lanham Act claims also sells products that are foreign-made; Milso does not dispute that it sells caskets made in Mexico. However, whereas in New Colt it appeared that all of the complaining party's revolvers were foreign-made ("it is undisputed that Defendants' revolvers are of foreign origin. . . . It is therefore unclear how Defendants are damaged.", id. at 234), here it is undisputed that Milso sells both American-made and Mexican-made caskets. The plaintiff argues that "to the extent Milso manufactures American made caskets, then Liberty's false advertising unfairly elevates its less desirable foreign-made product to compete on the same ground." (Pl.'s Opp. 31.) The court agrees that Milso has standing because it manufactures American-made caskets.

## 2. Per se violation based on the Tariff Act

The plaintiff argues, relying on Alto Prods. Corp. v. Ratek Indus. Ltd., No. 95 Civ. 3314 (LMM), 1996 WL 497027 (S.D.N.Y. Sept. 3, 1996), that the defendant failed to mark its caskets as "Made in China" in accordance with the Tariff Act, 19 U.S.C. § 1304, and

such failure constitutes a per se violation of the Lanham Act.[4]

In Alto Prods., the court placed weight on the "rationale underlying the marking requirements of the Tariff Act," id. at 5, and the logic supporting the holding in Bohsei Enter. Co., U.S.A. v. Porteous Fastener Co., 441 F. Supp. 162 (1977). See Bohsei, 441 F. Supp. at 164 ("To hold that omission of such a material fact [as country of origin] is not such a false representation as to affect the competition of the sale to the detriment of a seller who complies with the mandate of 19 U.S.C. § 1304 requires an utterly naive view of the realities of the market place."). In Alto Prods., the court reasoned:

> [T]he court now holds that failure to designate country of origin in violation of the Tariff Act violates § 43(a) of the Lanham Act as a matter of law. Logic dictates that in light of these considerations, a consumer encountering goods with no marking as to country of origin will assume that they are American-made, thus creating a likelihood of confusion with goods which are, in fact, American-made.

1996 WL 497027 at *5.

However, such a per se rule would be in conflict with the fact

---

[4]The Tariff Act provides, in relevant part, that:

> [E]very article of foreign origin . . . imported into the United States shall be marked in a conspicuous place as legibly, indelibly, and permanently as the nature of the article (or container) will permit in such manner as to indicate to an ultimate purchaser in the United States the English name of the country of origin of the article.

19 U.S.C. § 1304(a).

that "[t]he [Lanham] Act imposes no affirmative duty of disclosure
. . . and a claim cannot be based on the failure to disclose a
fact." <u>Clark Consulting, Inc. v. Fin. Solutions Partners, LLC</u>, No.
05 Civ. 06296(SAS), 2005 WL 3097892, at *3 n.38 (S.D.N.Y. Nov. 17,
2005) (citing <u>Agency Dev., Inc. v. Med Am. Ins. Co.</u>, 310 F. Supp.
2d 538, 547 (W.D.N.Y. 2004) ("Plaintiff's proposed claim must fail
because it cannot base a Lanham Act claim on the defendants'
failure to disclose a fact.")); <u>Avon Prods., Inc. v. S.C. Johnson
& Son, Inc.</u>, 984 F. Supp. 768, 798 (S.D.N.Y. 1997) ("[T]he Lanham
Act 'impos[es] no affirmative duty of disclosure.'") (quoting <u>Int'l
Paint Co. v. Grow Grp., Inc.</u>, 648 F. Supp. 729, 730 (S.D.N.Y.
1986)); <u>Int'l Paint Co.</u>, 648 F. Supp. at 730 ("[T]his court has
construed the reach of § 43(a) of the Lanham Act proscription
against the false representations as imposing no affirmative duty
of disclosure."); <u>McNeilab, Inc. v. Am. Home Prods. Corp.</u>, 501 F.
Supp. 517, 532 (S.D.N.Y. 1980) ("[A] failure to inform consumers of
something, even something that they should know, is not per se a
misrepresentation actionable under section 43(a) of the Lanham
Act.")).

In analyzing whether a claim can be based on a failure to
disclose, the court in <u>Universal City Studios, Inc. v. Sony Corp.
of America</u> reasoned:

> Rather than looking to case law, therefore, it is
> necessary to look to the statute.  It is hard to see how

> a simple failure to disclose can be brought within its terms.  No reference to omissions of material fact or obligation to disclose such as is found in other federal statutes (e.g. 15 U.S.C. § 77l) appears.  The key language seems to be "false description," false "representation," and false "designation of origin." The absence of any statement is neither "false" nor a "representation."  And it is difficult to see where such a disclosure requirement, if implied, would end, for no limits on the extent and nature of that disclosure can be readily deduced.

429 F. Supp. 407, 410 (C.D. Cal. 1977).

In addition, in the absence of language in the statute such a per se rule would inappropriately restrict the ability of the finder of fact to evaluate the particular circumstances of each case.  Cf. York Grp., Inc. v. York S., Inc., Civil Action No. H-06-0262, 2006 WL 3057782, at *7 (S. D. Texas Oct. 25, 2006) (rejecting the argument that an alleged Tariff Act violation is a per se violation of the Lanham Act because, inter alia, the Fifth Circuit has "expressed its refusal to interfere with or predict factual determinations by administrative agencies . . . .").  Any number of factual scenarios will be present in cases where a claim is brought pursuant to § 43(a) of the Lanham Act.  While it is likely that in a number of those cases the factual representations made will be false or misleading in the absence of a designation of origin in accordance with the Tariff Act, it is also likely that in at least some instances the factual representations will not be false or misleading in the absence of a designation in accordance with the

45

Tariff Act.

### 3. False Designation of Origin; Literally False Advertising

To the extent the plaintiff is advancing a claim for false designation of origin that does not rely on its argument that a violation of the Tariff Act constitutes a <u>per</u> <u>se</u> violation of the Lanham Act, that claim for false designation of origin rests on the same argument and evidence as the plaintiff's Lanham Act claim for literally false advertising. Although the plaintiff argues that Liberty's Chinese-made caskets are either never marked as "Made in China" or are marked with such a flimsy sticker that it is removed or falls off, the plaintiff has produced no evidence in support of these assertions. The plaintiff has, however, created a genuine issue as to whether the stickers designating caskets as having been manufactured in China are inadequate to inform consumers that those caskets are made in China. Relying on this evidence, Milso contends that Liberty's extensive use of American iconography, including the name of the company and its logo containing the Statue of Liberty wrapped in an American flag, constitute a false designation of origin and literally false advertising in view of the fact that the stickers designating caskets as having been manufactured in China are inadequate under the circumstances to inform consumers that the caskets are made in China.

Although the company name, "Liberty Casket," and the iconography of the Statue of Liberty and the American flag evoke clear associations with the United States of America, these words and symbols are too general to evoke any specific geographical associations or to support an inference that there is an implied claim of domestic manufacture. See Hamilton-Brown Shoe Co. v. Wolf Bros. & Co., 240 U.S. 251, 256 (1916) ("We do not regard the words 'The American Girl,' . . . [used] in connection with shoes . . . as being a geographical or descriptive term. It does not signify that the shoes are manufactured in America, or intended to be sold or used in America, nor does it indicate the quality or characteristics of the shoes."); Forschner Grp., Inc. v. Arrow Trading Co., 30 F.3d 348, 355 (2d Cir. 1994) ("The phrase Swiss Army knife cannot fairly be read to say 'made in Switzerland' so as to be geographically descriptive. Therefore, the use of the phrase by the distributor of a knife made in China does not constitute false advertising.").

Therefore, the defendants' motion for summary judgment on the plaintiff's claims for false designation of origin and for literally false advertising in violation of the § 43(a) of the Lanham Act is being granted, and the plaintiff's motion is being denied.

### 4.   Claim for Impliedly False Advertising

"'[P]laintiffs alleging an implied falsehood are claiming that a statement, whatever its literal truth, has left an impression on the listener [or viewer] that conflicts with reality' – a claim that 'invites a comparison of the impression, rather than the statement with the truth.' . . . Therefore, whereas 'plaintiffs seeking to establish a literal falsehood must generally show the substance of what is conveyed, . . . a district court <u>must</u> rely on extrinsic evidence [of consumer deception or confusion] to support a finding of an implicitly false message.'"   <u>Time Warner Cable, Inc. v. DIRECTV, Inc.</u>, 497 F.3d 144, 153 (2d Cir. 2007) (quoting <u>Schering Corp. v. Pfizer, Inc.</u>, 189 F. 3d 218, 229 (2d Cir. 1999)).

"[T]he success of a plaintiff's implied falsity claim usually turns on the persuasiveness of a consumer survey."   <u>Johnson & Johnson * Merck Consumer Pharm. Co. v. Smithkline Beechman Corp.</u>, 960 F.2d 294, 298 (2d Cir. 1992).   "[W]here the plaintiff cannot demonstrate that a statistically significant part of the commercial audience holds the false belief allegedly communicated by the challenged advertisement, the plaintiff cannot establish that it suffered any injury as a result of the advertisement's message."   <u>Id.</u>

The plaintiff contends that "[t]he [Poret] Report conclusively demonstrates that omission of the words 'Made in China' from Liberty's lithographs is materially misleading to consumers with a

48

deception rate significantly higher than 20%."  (Pl.'s Br. 55.)
However, the record supports the defendant's contention that "the
Poret study provides no evidence that 'a statistically significant
part of the commercial audience holds the false belief allegedly
communicated by the challenged advertisement.'"  (Mem. Law Supp.
Defs.' Mot. Summ. J. (Doc. No. 132) 40 (citing Johnson & Johnson,
960 F.2d at 298).)

The Poret Report explains how the study was designed:

STUDY DESIGN

400 qualified respondents participated in this study,
which was conducted in 9 locations in Connecticut and
Massachusetts.

The objectives of the study were to determine: (a)
whether or not the information that a Liberty casket is
made in China would be material to a potential casket
purchaser; and (b) whether the failure to properly
disclose such information is misleading to consumers.
Accordingly, a standard market research experiment was
designed to test whether the presence or absence of such
information would potentially impact a consumer's
decision about which casket to purchase.

The experiment was composed of two Cells.

200 respondents were assigned at random to Cell 1 and 200
to Cell 2.

Overview of Design

Respondents in Cell 1 were shown a booklet containing
three lithographs of Liberty caskets and a booklet
containing three lithographs of Matthews caskets.  The
Liberty lithographs did not designate the caskets as
being made in China.  Respondents were then asked which
casket (out of the six shown to them) would be their

first, second, and third choices to buy (if they had a
preference or preferences at all).

Respondents in Cell 2 were also shown a booklet
containing three lithographs of Liberty caskets and a
booklet containing three lithographs of Matthews caskets.
The Matthews booklet was identical to the booklet shown
to Cell 1.  The Liberty booklet was the same as the one
shown to Cell 1 except that the lithographs were changed
to indicate that the Liberty caskets are "Made in China."
Respondents were then asked the identical question as in
Cell 1 – which casket (out of the six shown to them)
would be their first, second, and third choices to buy
(if they had a preference or preferences at all).

(Decl. Hal Poret (Doc. No. 129-6), Ex. A – Expert Report of Hal

Poret, 6.)  The "Summary of Key Findings and Opinions" includes

five findings and opinions.  The final finding and opinion is: "5)

Based on the survey results, it is my opinion to a high degree of

professional certainty that the information that a Liberty casket

is made in China is material to consumers and that the omission of

such information is misleading to consumers."  (Id. at 18.)

Although Poret's survey would support a conclusion that

information that a casket is made in China is material to

consumers, it does not support a conclusion that the omission of

such information from Liberty's advertising and promotional

materials renders them impliedly false.  No part of Poret's survey

focused on Liberty's advertising and promotional materials and

whether they suggest that Liberty's caskets are manufactured

domestically.  Nor for that matter did any part of the study focus

on advertising and promotional materials in general to determine what characteristics of such materials, if any, would suggest to consumers that a product is manufactured domestically. Rather, the Poret Report draws an inference that because information that a casket is made in China is material to consumers, the omission of such information is misleading to consumers, which is a conclusion that would apply to the promotional materials of any company in the industry. However, Milso's claim here is not that omission from a casket manufacturer's advertising and promotional materials of the fact that a casket is made in China renders them impliedly false, and for that reason Liberty's advertising and promotional materials violate the Lanham Act, but rather that Liberty's pervasive use of American iconography, including the name of the company and its logo, requires disclosure of the fact that its caskets are manufactured in China in order for Liberty's advertising and promotional materials not to be implicitly false.

In addition, the mere fact that information that was material to consumers was omitted in advertising and promotional materials is not enough to support a claim under the Lanham Act in light of the fact that "the Lanham Act 'impos[es] no affirmative duty of disclosure.'" Avon Prods., 984 F. Supp. 768 at 798 (quoting Int'l Paint Co., 648 F. Supp. 729).

Therefore, the defendants' motion for summary judgment on the

51

plaintiff's claim for impliedly false advertising in violation of the Lanham Act is being granted, and the plaintiff's motion is being denied.

**L.   Declaratory Judgment (Count One of Counterclaim)**

In the First Counterclaim, the defendants seek a declaratory judgment that the Employment Agreements are unenforceable.  For the reasons set forth above in the discussion of the plaintiff's First Cause of Action, there are genuine issues of material fact as to whether the Employment Agreements are enforceable.  Therefore, both motions for summary judgment as to the First Counterclaim are being denied.

**M.   "Sham" Litigation in Violation of CUTPA (Count Two of Counterclaim)**

The defendant's Second Counterclaim is that Milso violated CUTPA by filing "sham" litigation.  The Second Circuit has held that "the filing of a single non-sham lawsuit-cannot form the basis for a CUTPA claim."  <u>Suburban Restoration Co., Inc. v. ACMAT Corp.</u>, 700 F.2d 98, 102 (2d Cir. 1983).  "Sham" litigation in the CUTPA context consists of "actions rife with abusive intent and absent any indicia of success," and "[f]actors present in sham litigation include, but are not limited to the presence of repetitive litigation . . . deliberate fraud, supplying false information, and whether lower courts have stated or implied that the action is

frivolous or objectively baseless and whether they have dismissed it out of hand." <u>Zeller v. Consolini</u>, 59 Conn. App. 545, 555 (2000).

Milso's action is not a "sham" lawsuit. First, the lawsuit is not "objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits." <u>Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.</u>, 508 U.S. 49, 50 (1993) (defining "sham" litigation). There is no evidence that could support a finding of fraudulent intent, repetitiveness, or frivolity on Milso's part, particularly in view of the fact a number of Milso's claims have survived summary judgment. Therefore, the plaintiff's motion for summary judgment on the Second Counterclaim is being granted, and the defendants' motion is being denied.

## IV.  CONCLUSION

For the reasons set forth above, Plaintiff's Motion for Summary Judgment (Doc. No. 129) is hereby GRANTED in part and DENIED in part, and Defendants' Motion for Summary Judgment (Doc. No. 122) is hereby GRANTED in part and DENIED in part.

Judgment shall enter in favor of the plaintiff with respect to the defendants' Second Counterclaim. Judgment shall enter in favor of the defendants with respect to the plaintiff's Third Cause of Action as to Larkin only (Breach of Fiduciary Duties), Fourth Cause

of Action only as to Boggia and Liberty insofar as relates to aiding and abetting Larkin (Aiding and Abetting Breach of Fiduciary Duties), Sixth Cause of Action (Tortious Interference with Contractual Relations), Ninth Cause of Action (Conversion), Tenth Cause of Action only as to the period beginning May 18, 2008 (Civil Conspiracy), Eleventh Cause of Action (Lanham Act claim for false designation of origin), and Twelfth Cause of Action (Lanham Act claim for false advertising).

It is so ordered.

Dated this 30th day of August 2012, at Hartford, Connecticut.


_____/s/_____
          Alvin W. Thompson
     United States District Judge